WILLIAM J. GEDDES
Nevada Bar No. 6984
KRISTEN R. GEDDES
Nevada Bar No. 9027
THE GEDDES LAW FIRM, P.C.
1575 Delucchi Lane, Suite 206
Reno, Nevada 89502
Phone: (775) 853-9455
Fax: (775) 299-5337
Email: Will@TheGeddesLawFirm.com
Email: Kristen@TheGeddesLawFirm.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| MICHAEL FAKER, individually, and MICHAEL FAKER, as parent and guardian for E.F., a minor.<br><br>Plaintiff,<br><br>vs.<br><br>WASHOE COUNTY SCHOOL DISTRICT a political subdivision of the State of Nevada; TAMMY HART, in her individual and official capacities; JASON URMSTON, in his individual and official capacities; and ROLLINS STALLWORTH, in his individual and official capacities.<br><br>Defendants. | CASE NO: 3:20-cv-00285<br><br><br><br>**COMPLAINT**<br><br>**JURY DEMAND** |

COMES NOW Plaintiffs MICHAEL FAKER, and E.F., by and through their counsel, William J. Geddes, Esq. and Kristen R. Geddes, Esq. of THE GEDDES LAW FIRM, P.C., and hereby complains of Defendants WASHOE COUNTY SCHOOL DISTRICT, TAMMY HART, JASON URMSTON and ROLLINS STALLWORTH, as follows.

**I.**

**STATEMENT OF THE CASE**

This is an employment and civil rights case arising under Title IX of the Civil Rights Act of 1964 and 42 U.S.C. § 1983.

1

For over 20 years, FAKER was the head of the girls' soccer program and coach of the girls' varsity soccer team at Spanish Springs High School, within the Washoe County School District, in addition to teaching at the school.  Historically, FAKER has complained for many years to on-site administration about disparate treatment of the girls' soccer teams' ability to use certain school property for practices and associated advantages vis-à-vis male athletes.

In 2018, FAKER's daughter, E.F., entered Spanish Springs High School as a freshman student. E.F. joined the junior-varsity girls' soccer team.  In 2018, FAKER again challenged the ability of girls' soccer teams' ability to use certain school property versus males, this time elevating his complaint to upper-level WCSD administration.  At the time FAKER complained in 2018, he did so as a coach and the head of the girls' soccer program complaining of Title IX violations concerning gender-based discrimination of female athletes.  In addition, FAKER, also complained as the parent of E.F., a female denied equal opportunities and benefits as male athletes.  Thus, FAKER also spoke as a private citizen on a matter of public concern.

In response to FAKER's complaints, Defendants participated in, condoned, and acquiesced in a sham investigation against FAKER into supposed misconduct and issued FAKER a false disciplinary write-up  and terminated FAKER as the girls' varsity soccer coach, a position he had held for over 20 years.  FAKER alleges herein that he suffered retaliation based on his complaints about discriminatory treatment of female athletes and his daughter based on sex.  FAKER seeks monetary, equitable, and injunctive relief.

In addition, E.F., alleges she has been subject to gender-based discrimination as a female athlete since entering SSHS in 2018.   She seeks monetary, equitable, and injunctive relief.

## II.

### JUISDICTION AND VENUE

1.    The federal claims of this case are maintained pursuant to 28 U.S.C. § 1331 ("[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States").  In particular, this case asserts civil rights claims, actionable under Title IX of the Education Amendments of 1972, codified at 20 U.S.C. § 1681 *et seq*., and 42 U.S.C. § 1983.

2.    Venue is proper in the U.S. District Court situated in Reno, Nevada, under Local Rule

The Geddes Law Firm, P.C.
1575 Delucchi Lane, Suite 206
Reno, NV 89502
Phone 775-853-9455

IA 1-6 and 28 U.S.C. § 1391(b) because this Court is located in the "unofficial Northern Division," embracing the City of Sparks, County of Washoe, Nevada, and because:

(a)    Defendant WASHOE COUNTY SCHOOL DISTRICT is a political subdivision of the State of Nevada serving as the school district for the County of Washoe, Nevada; and

(b)    Venue is proper in a judicial district in which a substantial part of the events or omissions giving rise to the claims of the case occurred, or where any defendant resides.

### III.

### PARTIES

3.     At all relevant times herein, Plaintiff MICHAEL FAKER ("FAKER") was a citizen of the state of Nevada, residing in the County of Washoe, Nevada, and he was employed by Defendant WASHOE COUNTY SCHOOL DISTRICT.

4.     At all relevant times herein, Plaintiff E.F. ("E.F."), a minor, was a citizen of the state of Nevada, residing in the County of Washoe, Nevada, and was a student at Spanish Springs High School under the purview of Defendant WASHOE COUNTY SCHOOL DISTRICT.

5.     Defendant WASHOE COUNTY SCHOOL DISTRICT ("WCSD") utilizes the various federal student aid programs that are authorized by Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1070 et seq. and 42 U.S.C. § 2751 et seq., and is therefore prohibited by Title IX from discriminating on the basis of sex in its programs and activities.

6.     At all relevant times herein, Defendant TAMMY HART ("HART") was the Principal of Spanish Springs High School, and she is sued herein in her official and individual capacities.

7.     At all relevant times herein, Defendant JASON URMSTON ("URMSTON") was the Assistant Principal of Spanish Springs High School, and he is sued herein in his official and individual capacities.

8.     At all relevant times herein, Defendant ROLLINS STALLWORTH ("STALLWORTH") was the Coordinator of the WCSD Department of Activities and Athletics, and he is sued herein in his official and individual capacities.

. . .

. . .

The Geddes Law Firm, P.C.
1575 Delucchi Lane, Suite 206
Reno, NV 89502
Phone 775-853-9455

The Geddes Law Firm, P.C.
1575 Delucchi Lane, Suite 206
Reno, NV 89502
Phone 775-853-9455

**IV.**

*General Allegations*

9.     At all relevant times herein, FAKER was, and is, a teacher at Spanish Springs High School ("SSHS") located in Sparks, Nevada.

10.     FAKER has been employed as a teacher at SSHS for 21-years, since the school opened in 1998, teaching chemistry, physics and physical science.

11.     In addition to teaching the subjects identified above, FAKER had been the only girls' varsity soccer coach from the time the school opened until he was terminated as the coach in 2018.

12.     In addition to coaching the varsity girls' soccer team for over two-decades, FAKER along with the SSHS athletic director, oversaw the girls' soccer program at SSHS in its entirety. FAKER's role in the girls' soccer program included annually hiring a coach for the junior varsity (JV) girls' soccer team, attending JV games and practices along with the JV coach to observe players and to provide coaching guidance to the JV coaches, preparing JV players for transition to the varsity team, and overseeing volunteer coaches. As well, because WCSD only funds two paid positions in the girls' soccer program, FAKER spearheaded fundraising for the girls' soccer program including raising funds for two additional stipend coaching positions and equipment, which he also oversaw.

*Facts Regarding Players S.G. and E.W.*

13.     S.G and E.W. started school at SSHS as freshmen in 2017, they tried out for and made the girls' JV soccer team.

14.     In 2018, S.G. and E.W. tried out again, and made the girls' JV soccer team again. S.G. and E.W. were upset by the fact that other freshmen girls made the varsity team while they did not.

15.     On or around August 16, 2018, E.W. came to FAKER's classroom to ask why she did not make the varsity team. FAKER spoke to her and told her the reasons why she did not make varsity and told her skills she could work on to help improve her performance. E.W. asked about S.G., and FAKER told E.W. that S.G. was in a similar situation and that he did not want to discuss S.G. any further.

16.     After that, S.G. and E.W. were talking badly about not making the varsity soccer team in the locker room, which was overheard by other players on the JV team, including E.F.

17.     Around August 18, 2018, FAKER heard from numerous players that S.G. and E.W. were talking badly in the locker room about not making the varsity team.

18.     FAKER spoke to S.G. and E.W. and told them they should come to him if they were upset by a situation, and not to talk badly or cause drama with other players in the locker room.  He also reminded them that not all players who try out will make the varsity team.

19.     On or about August 23, 2018, FAKER received a letter from STALLWORTH, Coordinator of the WCSD Department of Activities and Athletics, that a complaint had been made by a parent; however, the complaint was anonymous and contained no specifics.  Consequently, nothing further happened with the complaint.

20.     FAKER was never provided or shown a copy of the anonymous complaint.

21.     Toward the latter-part of the soccer season, around October 8, 2018, FAKER called S.G. up to practice with the girls' varsity team.  S.G. refused to play with the varsity team, stating she wanted to play with the JV team.  FAKER told S.G. that if she didn't want to play, she needed to sit and watch the varsity practice, which she did.

22.     On October 9, 2019, SSHS Athletic Director Art Anderson e-mailed FAKER and requested FAKER give him an explanation of what transpired the day before at practice regarding S.G., which FAKER did that same day.

23.     In a response back to FAKER, Anderson told FAKER to tell Erich Snider, [the head JV coach] not to sit a player out for refusing to play varsity.  Anderson then told FAKER "Please tell [S.G.] that you were wrong and she will play JV only this year.  I am going to call the mom and listen to her concerns and tell her that you are going to have a conversation with [S.G.] informing her that you were wrong and she can play JV for the reminder of the year."

24.     FAKER responded back to Anderson that that S.G. was only requested to practice with the varsity team and that S.G. was not being pulled up to the varsity team.  FAKER stated that periodically, he pulls JV girls up to practice with the varsity team.

25.     On or around October 23, 2018, a meeting was held with FAKER, Art Anderson, and S.G.'s parents, who were upset and alleged that S.G. was punished by not starting in the last JV game, allegedly for refusing to practice with the varsity team.

26.     FAKER denied that S.G. was punished by not starting her in the last JV game due to her refusal to practice with the varsity team.  Instead, FAKER explained that he and JV coach Erich Snider had changed the lineup and S.G. was moved to a new position that she held until the end of the year, where that position did not start in the next scheduled JV game.  This change was planed before S.G. was called up to varsity for practice and was the reason why she was called up to practice with the varsity team.

### WCSD Athletic Policies, Regulations and Published Governance Materials

27.     WCSD Board Policy 5300 governing *Student Activities* provides as it Guiding Principles § 2(a)-(b) that: The District offers a wide range of intra-curricular, extracurricular, District-recognized athletics, and District-sanctioned athletics to encourage student participation and enhance the learning environment, and that the District provides equal access to participation to all students, regardless of sex.

28.     Pursuant to the Guiding Practices - General Rules and Protocols of WCSD Board Policy 5300 at § 3(b)(v), "[t]he principal is responsible and accountable for the supervision of all student activities connected with the school. An on-campus staff member shall be designated to ser in an advisor role for any student or club organization.  The advisor shall report to school administration and ensure compliance with all District and site-based procedures related to student activities, to include decision-making, facilities use, security, finances, conduct of attendees, supervision. [sic]"

29.     WCSD Board Policy 5325 governs *District-Recognized Athletics*.  "District-recognized athletics" refers to competitive teams approved by the District, but not sanctioned by the Nevada Interscholastic Activities Association ("NIAA").

30.     WCSD Board Policy 5325, Guiding Principles § 2(b) provides that District staff and volunteers shall comply with the policies and regulations of the District, as well as any applicable state and federal laws and regulations.  This includes, but is not limited to, policies prohibiting, *inter alia*, discrimination.

31.     WCSD Administrative Regulation 5326 concerning *District-Recognized Athletics* defines an "external organization" as a non-profit organization dedicated to youth athletics/activities, responsible for financial aspects of a District recognized athletic team that co-sponsors such a team.

The Geddes Law Firm, P.C.
1575 Delucchi Lane, Suite 206
Reno, NV 89502
Phone 775-853-9455

32.     Pursuant to General Provisions § 2(a) of Administrative Regulation 5326, it provides that in implementing and maintaining student programs, District Staff and volunteers shall comply with the policies and regulations of the District, as well as any applicable state and federal laws and regulations including, but not limited to, the prohibition against, *inter alia*, discrimination.

33.     Additionally, the provisions in § 5 of Administrative Regulation 5326 concerning Use of School Facilities state that:

. . .

b. The District reserves the right to deny or amend an application [for an External Organization] when concerns exist related to adequate field space for District-sanctioned teams and activities or when field space is under repair.

. . .

f. District-sanctioned teams, activities, and events shall receive priority of use of school facilities over District-recognized athletic teams.   District-recognized athletic teams shall receive priority of use of school facilities over non-District athletics, activities, or other events.

34.     WCSD Board Policy 5340 concerns *District-sanctioned Interscholastic Athletics*. Guiding Principle § 1(b)(i) provides that in implementing and maintaining student programs, District Staff and volunteers shall comply with the policies and regulations of the District, as well as any applicable state and federal laws and regulations including, but not limited to, the prohibition against, *inter alia*, discrimination.   The Guiding Principle further provides that "[t]he Superintendent shall ensure that equivalent opportunities are provided for boys and girls."

35.     Baseball and soccer at SSHS are District-sanctioned athletics.

36.     WCSD Board Policy 7120 governs  *Community Use of School Buildings and Facilities*. The purpose of the Policy is stated as including community use of school buildings facilities and grounds so long as it does not conflict with the school's use of the school buildings and/or grounds for school purposes and activities, with state and federal laws, local ordinances, or with the proper care and maintenance of school buildings and facilities.

37.     Governing Principle § 1(b)(i) of Board Policy 7120 gives the District, in its sole discretion, permission for community use of buildings and facilities as long as the use does not interfere

The Geddes Law Firm, P.C.
1575 Delucchi Lane, Suite 206
Reno, NV 89502
Phone 775-853-9455

with intra-curricular activities, extra-curricular activities, District-recognized Athletics, and District-sanctioned Athletics.

38.    WCSD Board Policy 9200 concerns the prohibition of discrimination and harassment. Board Policy 9200 prohibits discrimination on its properties and in educational programs or activities on the basis of sex. *See* Board Policy 9200 § 1(b).

39.    Within the WCSD Board Policy 9200, the District commits to creating an environment free from discrimination including providing equal access to programs and services offered by the District. Students enrolled in the District shall receive and equal opportunity to achieve their maximum potential through the curricular, co-curricular and extra-curricular programs offered. Board Policy 9200 § 1(d)(2).

40.    The Governing Practices § 2(b) of Board Policy 9200 prohibits District employees from discrimination based on protected classes by refusing to permit the person to use facilities open to the public and owned, operated, or managed by or on behalf of the District, except in accordance with District policies and regulations or by refusing to grant a benefit to the person.

41.    Governing Practices § 2(e)-(f) of Board Policy 9200 states that individuals who witness or receive information of a violation of the policy report the possible violation to, *inter alia*, the school principal or designee. The District claims in Board Policy 9200 that it will act promptly on reports and complaints of discrimination which are brought to the attention of the District.

42.    The WCSD High School Activities and Athletics Manual expressly provides that: "**At no time should one sport program interfere with another program.** This especially holds true with a sport not in season interfering with a  program that is in season." (Emphasis original).

### *Disparate Treatment of Female Athletes vs. Male Athletes*

43.    The high-school soccer season starts around mid-July, with tryouts and team practices commencing prior to the start of the school year. The soccer season ends in early-November.

44.    For at least 15 years prior to 2018, FAKER, as the girls' varsity soccer coach, persistently requested to use the boys' baseball field at SSHS for practices for the girls' soccer program.

45.    The high school baseball season generally begins in the Spring; thus, the boy's baseball

The Geddes Law Firm, P.C.
1575 Delucchi Lane, Suite 206
Reno, NV 89502
Phone 775-853-9455

8

field would be available for use for practices by the girls' soccer teams as high school baseball was offseason while the soccer season was ongoing.

46.     FAKER repeatedly requested use of the boys' baseball field for the girls' soccer program, as use of the baseball field, which has more space, was the best interest of the girls' teams because more space could better approximate field size and game-related conditions for the girls' soccer teams.

47.     Although SSHS has girls' softball fields, those fields are smaller than the boys' baseball field, and are too small to approximate soccer field size and game-related environments.

48.     The girls' JV soccer team has historically been forced to practice on an SSHS practice field that is narrower and shorter than a regular game field; thus, the JV girls' team does not have an opportunity to practice in a full-field, or near-full field environment, which impairs skills development and team building activities due to a reduced number of players practicing at any one-time.

49.     This narrow and short practice field is among a collection of fields known as the "upper practice fields" at SSHS where numerous teams and sports compete for space and time to practice.

50.     For example, there are three SSHS football teams: freshman, JV and varsity.   The football teams practice on the upper practice fields at the same time as the soccer teams.   The three football teams each practice on a field approximately 50-yards long, which fields are adjacent to the fields used by the soccer teams.

51.     There are also four soccer teams requiring practice fields: girls' varsity and JV, and boys' varsity and JV.

52.     Besides the narrow, short field where the girls' JV soccer team practices, there is a larger field that more aptly mirrors a full-size soccer field; however, that larger field is shared between the varsity soccer teams.

53.     In addition, there is the stadium field where the girls' and boys' soccer games are played.   The stadium field is located in the center of the track field, and is also used for football games, lacrosse club in the offseason, Sparks Youth Football League and Pop Warner football, and is thus not available for practice by the girls' soccer program except on Mondays.   Additionally, heavy use of the stadium field for soccer games, numerous football program and lacrosse results in heavily degraded

The Geddes Law Firm, P.C.
1575 Delucchi Lane, Suite 206
Reno, NV 89502
Phone 775-853-9455

field conditions affecting performance of the girls' soccer teams during playoffs.

54.     There have been years where the SSHS girls' JV soccer team has had to walk nearly 1-mile to Eagle Canyon Park to practice on the park fields.  The students have been forced to walk down Eagle Canyon Drive, a heavy-traffic thoroughfare, to the park, which presents safety issues to the students and left FAKER unable to monitor and assist the girls' JV team while the team was offsite.

55.     Additionally, for over 10 years, the girls' varsity soccer team has been required to practice weekly at the Golden Eagle Sports Complex, 7-miles away on the other side of Spanish Springs Valley, when a field is available at the Golden Eagle Sports Complex.  Requiring female students to attend practice 7-miles away offsite, poses significant logistical difficulties for the athletes to find transportation to off-site practices.

56.     FAKER has seen many changes in administration at SSHS during his 21-years working there. With each onsite administration change, FAKER has made requests and/or complained to onsite administration including various principals, assistant principals and athletic directors at SSHS about the inability of the girls' soccer teams to use the boys' baseball field for its practices.

57.     Each year that FAKER requested from and/or complained to onsite administration about the inability of the girls' soccer teams to use the boys' baseball field for practices, his complaints and requests have been denied.

58.     Following each soccer season, FAKER receives a separate coaching evaluation in addition to a teaching evaluation.  In his coaching evaluations, FAKER has also repeatedly stated that more field space is needed for the girls' soccer program.

59.     Approximately 3-4 years ago, the field-use issue came to a head when WCSD changed the school calendar schedule.  The school year was changed to start earlier, but WCSD did not change the soccer tryout dates; thus, the school year started prior to tryouts and teams being formed leaving insufficient time and space for athletes to practice and prepare for tryouts.

60.     During the soccer tryout period, there are approximately 75 boys trying out along with while 50-60 girls, all located on the upper practice fields, competing for space to try out.

61.      Only in 2017 and 2018, were the girls were permitted to use the boys' baseball field for tryouts for approximately 2-weeks.  After tryouts, FAKER was directed by Art Anderson, SSHS

The Geddes Law Firm, P.C.
1575 Delucchi Lane, Suite 206
Reno, NV 89502
Phone 775-853-9455

Athletic Director, that use of the boys' baseball was no longer permitted.

62.    In or around August 2018, at the start of the soccer season for the 2018-2019 school year, FAKER sent a letter to JASON URMSTON, Assistant Principal, complaining again about the girls' soccer program not having sufficient space to practice, again pointing out that the boys' baseball field is not permitted for use by the girls' soccer program – despite FAKER's numerous prior requests and complaints.

63.    FAKER also described that not only were the girls' soccer teams not permitted to use the boys' baseball field for practices, but the SSHS baseball coach received approval to rent the boys' baseball field to Velocity Baseball, a boys' baseball club team not affiliated with SSHS, in order to raise funds directly for the SSHS baseball program.  Through its ability to rent the baseball field for its program, the SSHS boys' baseball program allegedly has been able to install extravagant features such as a press box and batting cages for use by the SSHS' boys' baseball program.

64.    The ability of the SSHS boys' baseball team to rent the baseball field to raise money for the baseball program was an advantage not similarly provided for the girls' soccer program, and FAKER had no ability to rent the fields used by the girls' soccer teams in order to raise funds for the girls' soccer program; consequently, where the girls' soccer program was forced to conduct off-site fundraising activities, it has barley covered the cost of new balls, coaching equipment, pay for assistant coaches and coaches' equipment.

65.    FAKER also told URMSTON that he had received complaints from other parents of players on the girls' JV team questioning why their daughters were on a "tiny piece of grass" and an off-campus organization was on the baseball field.

66.    FAKER also stated to URMSTON that his daughter, E.F., had just entered SSHS as a freshman and was a player on the girl's JV soccer team; consequently, FAKER complained about the unequal treatment of daughter, also, compared to the advantages and opportunities for adequate practice facilities and fundraising opportunities available to male athletes.   Specifically, FAKER told URMSTON, "I am more than just a coach now.  My daughter is practicing 4 v 4 to prepare for 11 v 11 on a tiny field **while the baseball program is making money renting their field**."  (Emphasis original).

11

The Geddes Law Firm, P.C.
1575 Delucchi Lane, Suite 206
Reno, NV 89502
Phone 775-853-9455

67.     On or around September 12, 2018, URMSTON replied in an e-mail to FAKER as follows:

> Mike:
> We are going to continue to stay off the baseball field for this year, and we will meet with Anderson and Ortiz [the football coach] to discuss the rotations for next year.  Please continue to work with Art Anderson to use other areas when available, like how the stadium was used when Golden eagle was not available, or when upper fields are vacant.

68.     Although FAKER had complained about the unequal treatment of the girls' soccer program in many prior years, the fact that E.F. started as freshman student at SSHS in the 2018-2019 school year motivated FAKER this time elevate his complaint beyond SSHS on-site administration.

69.     Unsatisfied with URMSTON'S response on September 12, 2018, FAKER, for the first time, elevated his complaint about unequal treatment of the girls' soccer teams to WCSD Administration, including by contacting STALLWORTH.

70.     At the time FAKER contacted STALLWORTH, STALLWORTH was also serving as the Vice President of the Nevada Interscholastic Activities Association, the body statutorily created pursuant to NRS 385B, *et seq.* to govern interscholastic activities.

71.     STALLWORTH agreed with FAKER that the unequal treatment of the girls' soccer program constituted possible violations of Title IX.

72.     STALLWORTH prepared a draft Memorandum on letterhead that identified it was "From the Department of Student Activities & Athletics," entitled "Possible Violation of Title IX Issues at Spanish Springs High School."

73.     The Memorandum contained a bulleted list of "Conversation/Action Points," including:

- Girls Soccer Program is not being treated fair at Spanish Springs

- Limited Full/Adequate Practice Field space is the issue

- Limited field space available for all sanctioned sports team [sic] to practice

- Some fall sports teams are practicing late in the evening after school

- Baseball Team/Field is getting preferential treatment

- Spanish Springs Club Baseball Team and Community Club Baseball Team Practicing after-school during fall practice times.

74.    In addition, the Memorandum contained a bulleted list of solutions to address this issue "head-on" including, *inter alia*:

- Currently, the Spanish Springs boy's baseball team has exclusive rights to their field and in doing so has their club team and community club teams practicing on their field.

- Under WCSD Policy 5325 g.IV, these programs do not have the exclusive rights to take away a field from a sanctioned sport activity.  Under the new policy the order of priority of field use is as follows:
    - 1-Sanctioned sport games or practices
    - 2-WCSD Recognized Sport/Activity
    - 3-Community Club Sports/School Club Sports

- The Spanish Springs Administration would have to open the boys' varsity baseball field up for practice time during the fall sanctioned sports season.

    . . .

- Regarding the Title IX concern, the issue of adequate practice field space is the major problem here where the current limited practice space has created an equity problem between the boys' program and the girls program.

75.    STALLWORTH also prepared a draft spreadsheet to accompany the Memorandum that tallied the number of athletic contests per week at SSHS among football and soccer.

76.    On or around September 28, 2018, STALLWORTH sent the draft Memorandum and spreadsheet to FAKER via e-mail, stating:

> Mike:
>
> Please read the attachment and let me know what you think.
> We can take this to the Office of Civil Rights of you want to.
>
> Mr. Rollins Stallworth
> M.Ed., Physical Ed., CSA
> Coordinator , WCSD Department of

The Geddes Law Firm, P.C.
1575 Delucchi Lane, Suite 206
Reno, NV 89502
Phone 775-853-9455

Activities and Athletics
NIAA Board of Directors
Vice President 2017-2019

77.     FAKER responded on October 9, 2019, that he wanted to proceed with filing complaint with the Office of Civil Rights.   FAKER told STALLWORTH that he was attempting to collect signatures of other parents as STALLWORTH had previously advised FAKER to do.   FAKER stated a group of parents were working on collecting signatures, and FAKER questioned whether the complaint should wait until the signatures were collected.   STALLWORTH told FAKER to wait until the signatures were collected and FAKER responded that he would get the signatures that weekend.

78.     Thereafter, FAKER did obtain said signatures, which were provided to STALLWORTH.

79.     On information and belief, upon STALLWORTH's receipt of the complaint from FAKER, STALLWORTH notified SSHS administration of FAKER's complaint.

80.     On information and belief, a person in SSHS administration forwarded the information to a someone associated with the SSHS boys' baseball program.   That person, believed to be a parent or booster associated with the boys' baseball program, called or e-mailed STALLWORTH shortly thereafter and told STALLWORTH to "stay in his lane."   STALLWORTH told FAKER about the contact he received, which FAKER interpreted to mean not to allow the girls' soccer teams access to the boys' baseball field for practices.

81.     As alleged further herein, Defendants retaliated against FAKER by disciplining him and terminating him as the girls' soccer coach.   After said retaliation and termination, it was determined by STALLWORTH that FAKER would not be a good candidate to lodge the Title IX complaint with the Office of Civil Rights.   Additionally, STALLWORTH told FAKER that a parent was still necessary to spearhead the complaint to the Office of Civil Rights.

82.     After the retaliatory discipline and termination of FAKER as the girls' soccer coach, FAKER approached other parents to pursue the Title IX complaint to the Office of Civil Rights.   No other parent would agree to do so fearing retaliation against their child/student by Defendants.

. . .

. . .

. . .

14

The Geddes Law Firm, P.C.
1575 Delucchi Lane, Suite 206
Reno, NV 89502
Phone 775-853-9455

***Retaliatory Discipline and Termination from Coaching Position***

83.     On January 25, 2019, FAKER was served with a Notice of Investigatory/Due Process Meeting and Right to Representation.  FAKER was instructed to attend a meeting on January 30, 2019, to discuss a bulleted list of twenty-two (22) allegations of that FAKER bullied and retaliated against S.G. and E.W. and also used racist language.

84.     On January 30, 2019, FAKER attended the meeting that was also attended by: Jason Urmston, Assistant Principal; Amanda Gormley, Administrative Investigator; Virginia Doran, Director of Labor Relations; Tammy Hart, Principal; and, Chuck Fletcher, Washoe County Education Association (WCEA) representative.

85.     After the Investigatory/Due Process Meeting, FAKER was served with a Letter of Admonition (LOA) on March 21, 2019.  The LOA contained conclusions that FAKER engaged in retaliation and bullying of S.G. and E.W.  The LOA concluded that there was no evidence of racist statements made by FAKER, yet the LOA obscurely stated that FAKER's actions "could be interpreted by others as being racist regardless of the intent."

86.     The LOA also concluded that FAKER's coach as a club team interfered with his duties as an SSHS coach, despite that for many years prior, FAKER dually-coached girls' soccer at SSHS and a local club team.

87.     FAKER was terminated as the head girls' soccer coach and removed from all responsibilities with the girls' soccer program.

88.     FAKER filed a grievance regarding the LOA, which grievance was initiated at Level-Two of the WCSD grievance process due to the SSHS Assistant Principal, Jason Urmston, having issued the LOA being grieved.

89.     In the Level-Two grievance, FAKER challenged the findings of the LOA, raising specific arguments challenging the finding of the LOA, including:

> (1) FAKER argued that assistant varsity girls' coach Ryan Long did not create a score sheet for E.W. and S.G.; therefore, the allegation that they were at the top of everyone else's score sheets and were on the bottom of FAKER's could not be true. FAKER was the only one to complete a score sheet, and that the investigator and/or

The Geddes Law Firm, P.C.
1575 Delucchi Lane, Suite 206
Reno, NV 89502
Phone 775-853-9455

WCSD staff willfully refused to interview coach Long regarding this or any allegation.

(2) FAKER denied that he talked about E.W. and S.G. to other students and that the investigator and/or WCSD staff willfully refused to interview individuals identified by FAKER to refute this allegation.

(3) FAKER challenged the finding that he was dishonest about the anonymous complaint described above in Paragraph 18, inasmuch as the complaint was anonymous and WCSD took no action regarding the complaint.

(4) FAKER challenged the notion that S.G. and E.W. were scared by FAKER when he told them to come to him with any issues.  FAKER asserted that this was never brought up in the meeting with S.G.'s parents, and that this was raised later by the parents in a contrived scheme to get FAKER terminated as coach.

(5) FAKER argued that as coach, he retained that ultimate authority to determine what positions players play, which players start, and how much playing time they get, and that these decisions were not "bullying" as defined by WCSD policies and NRS 388.122.

(6) FAKER denied not starting S.G. in retaliation or bullying, and that her not starting was due to a formation change, which was decided by FAKER and coach Snider even before S.G. was requested to practice with the varsity team.  Further, FAKER argued that in every game, there are 4-8 players who do not start in the game; consequently, not starting in a game is not a punishment, but is part of organized sports and that there will always be players who do not start in the game.

(7) FAKER alleged that the investigator and/or WCSD staff willfully refused to interview individuals identified by FAKER to refute the allegation that he used racist language, and that only individuals were interviewed that had negative opinions or information about FAKER, resulting in a biased investigation.

90.    On May 13, 2019, Area 3 Superintendent Joe Ernst denied FAKER's Level-Two grievance and affirmed the LOA and the termination of FAKER as the varsity soccer coach.

16

The Geddes Law Firm, P.C.
1575 Delucchi Lane, Suite 206
Reno, NV 89502
Phone 775-853-9455

91.    Thereafter, FAKER elevated his grievance to Level-Three, which was heard by Acting Superintendent Kristen McNeil.

92.    Acting Superintendent McNeil denied FAKER's Level-Three grievance.

93.    Defendants conducted and condoned an inadequate and biased investigation to punish and retaliate against FAKER for his complaints about unequal treatment of female athletes, including that of his daughter, E.F, and other female soccer players.

94.    After FAKER was terminated at the conclusion of the 2018-2019 soccer season, during the 2019-2020 school year, the girls' soccer program was not allowed to use the boys' baseball field for practices, despite URMSTON's September 12, 2018, assertion that rotations for use of the baseball field would be addressed the following year, *i.e.,* 2019-2020.

95.    Defendants have refused to remedy the ongoing Title IX violations at SSHS, in an effort to appease SSHS boys' baseball parents and/or boosters and other outside organizations comprise of male athletes at the expense of providing equal facilities and opportunities to female athletes.

96.    During FAKER's tenure as the girls' varsity soccer coach, FAKER has consistently received outstanding performance evaluations on his coaching evaluations.

97.    For example, FAKER's coaching evaluation for the 2017-2018 season, rated him a Level 3 "Area of Strength" in every single category, and he was recommended for continued coaching assignment.

98.    Despite having been SSHS' only girls' varsity soccer coach for the preceding 20 years, FAKER was terminated as the varsity girls' soccer coach after the 2018-2019, and consequently, has been denied supplemental pay for that position in subsequent seasons.

99.    For the 2019-2020 school year, FAKER was replaced by a coach with far less coaching experience than FAKER, to coach to the varsity girls' soccer team.

100.    FAKER is a well-respected soccer coach in the community, and his termination as the varsity coach and program-head at SSHS has been a topic of gossip and speculation in the community that FAKER is a bully and is racist towards students.

101.    FAKER continues to be employed as a teacher at SSHS.

. . .

17

**V.**

**FIRST CLAIM FOR RELIEF**

**(E.F. against DEFENDANT WCSD)**
**(Disparate Treatment in Violation of Title IX of the Education Amendments of 1972- 20 U.S.C. §**
**1681(a), *et seq.*)**

102.     Plaintiffs incorporate by reference all prior allegations of this *Complaint*, as though fully set forth herein.

103.     Title IX of the Education Amendments of 1972 ("Title IX") provides in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

104.     E.F. is a female student at SSHS and was a member of the JV girls' soccer team during the 2018-2019 and 2019-2020 school years.

105.     Due to Defendant WCSD employees' and agents' intentional and conscious failure to comply with Title IX, E.F. was denied equal treatment and benefits in athletic programs versus the benefits and treatment conferred on male athletes.

106.     As a result of such intentional, unlawful, and discriminatory conduct against E.F., E.F. has suffered, and continues to suffer, economic losses, for which she is entitled to monetary damages, in an amount to be proven at trial.

107.     The unlawful discrimination against E.F. by Defendant WCSD, including through its employees and agents, was willful, malicious, and/or engaged in with a reckless indifference to the health, safety, wellbeing, and federally-protected rights of E.F.—including where Defendant WCSD employees and agents were aware of ongoing violations, acknowledged the existence of such violations in 2019, and willfully refused to remedy such discrimination — warranting an award of punitive damages, to punish Defendant WCSD, in an amount determined by a jury at trial, according to law.

108.     As a result of such intentional, unlawful, and discriminatory conduct against E.F. by Defendant WCSD, including through its employees and agents, E.F. has had to retain the services of attorneys in this matter, and she, therefore, is entitled to, and seeks reimbursement for, her attorneys' fees and costs, her expert-witness fees, and her court costs, in an amount to be proven at trial.

The Geddes Law Firm, P.C.
1575 Delucchi Lane, Suite 206
Reno, NV 89502
Phone 775-853-9455

109.    As a result of such intentional, unlawful, and discriminatory conduct against E.F. by Defendant WCSD, including through its employees and agents, E.F. is entitled to, and seeks, declaratory relief, in the form of a declaration by this Court, that Defendant WCSD violated E.F.'s rights and injunctive relief to correct such violations.

**VI.**

**SECOND CLAIM FOR RELIEF**

**(E.F. against DEFENDANT WCSD)**
**(Disparate Impact in Violation of Title IX of the Education Amendments of 1972- 20 U.S.C. § 1681(a), *et seq*.)**

110.    Plaintiffs incorporate by reference all prior allegations of this *Complaint*, as though fully set forth herein.

111.    Defendant WCSD maintains a series of Board Policies, Administrative Regulations, and Published Guidance Materials purporting to prohibit discrimination, including in, *inter alia*, District-sanctioned athletics.

112.    Actions taken pursuant to Defendant WCSD's facially neutral policies, regulations and guidance materials by  its employees and agents disparately and adversely affected E.F.'s rights to participate as a female athlete in District-sanctioned athletics, versus males' participation in District-sanctioned athletics and also males athletes from outside organizations.

113.    As a result of such discriminatory conduct against E.F., E.F. has suffered, and continues to suffer, economic losses, for which she is entitled to monetary damages, in an amount to be proven at trial.

114.    The unlawful discrimination against E.F. by Defendant WCSD, including through its employees and agents, was willful, malicious, and/or engaged in with a reckless indifference to the health, safety, wellbeing, and federally-protected rights of E.F.— warranting an award of punitive damages, to punish Defendant WCSD, in an amount determined by a jury at trial, according to law.

115.    As a result of such, unlawful, and discriminatory conduct against E.F. by Defendant WCSD, including through its employees and agents, E.F. has had to retain the services of attorneys in this matter, and she, therefore, is entitled to, and seeks reimbursement for, her attorneys' fees and costs, her expert-witness fees, and her court costs, in an amount to be proven at trial.

The Geddes Law Firm, P.C.
1575 Delucchi Lane, Suite 206
Reno, NV 89502
Phone 775-853-9455

116.    As a result of such unlawful, and discriminatory conduct against E.F. by Defendant WCSD, including through its employees and agents, E.F. is entitled to, and seeks, declaratory relief, in the form of a declaration by this Court, that Defendant WCSD violated E.F.'s rights and injunctive relief to correct such violations.

## VII.

### THIRD CLAIM FOR RELIEF

**(FAKER against ALL DEFENDANTS)**
**(Unlawful Retaliation in Violation of Title IX of the Education Amendments of 1972- 20 U.S.C. § 1681(a), *et seq.*)**

117.    Plaintiffs incorporate by reference all prior allegations of this *Complaint*, as though fully set forth herein.

118.    It is unlawful to retaliate against an individual for making a complaint of unlawful discrimination in violation of Title IX.

119.    FAKER engaged in protected activity when he complained as the coach and head of the girls' soccer program at SSHS, about the unequal treatment and benefits of the girls' soccer program arising to unlawful sex discrimination in violation of Title IX, including when Defendants intentionally discriminated against female student athletes by failing to provide female student athletes equal treatment and benefits as compared to male athletes, and Defendants ignored FAKER'S complaints, and continued its purposeful, differential treatment despite persistent complaints by FAKER.

120.    As a result of such intentional, unlawful, and retaliatory conduct against FAKER by Defendants' disciplining him and terminating him as the head of the girls' soccer program and girls' varsity soccer coach, FAKER has suffered, and continues to suffer, economic losses, including lost wages and benefits, back pay, front pay, physical and emotional harm, including mental anguish, inconvenience, and the loss of enjoyment of life, for which he is entitled to compensatory and equitable damages, in an amount to be proven at trial.

121.    The unlawful retaliation against FAKER by Defendants was willful, malicious, and/or engaged in with a reckless indifference to the health, safety, wellbeing, and federally-protected rights of FAKER—including because Defendants summarily terminated FAKER from his coaching position after he pursued his rights to speak on such matters —warranting an award of punitive damages, to

The Geddes Law Firm, P.C.
1575 Delucchi Lane, Suite 206
Reno, NV 89502
Phone 775-853-9455

punish Defendants, in an amount determined by a jury at trial, according to law.

122.    As a result of such intentional, unlawful, and discriminatory conduct against FAKER by Defendants, including through their employees and agents, FAKER has had to retain the services of attorneys in this matter, and he, therefore, is entitled to, and seeks reimbursement for, his attorneys' fees and costs, his expert-witness fees, and his court costs, in an amount to be proven at trial.

123.    As a result of such intentional, unlawful, and retaliation against FAKER by Defendants, FAKER is entitled to, and seeks, declaratory relief, in the form of a declaration by this Court, that Defendant WCSD violated FAKER'S rights.

## V.

### FOURTH CLAIM FOR RELIEF

### (FAKER against ALL DEFENDANTS)

### 42 U.S.C. § 1983
### (Violation of Rights Secured by the Free Speech Clause of the First Amendment)

124.    Plaintiffs incorporate by reference all prior allegations of this *Complaint*, as though fully set forth herein.

125.    FAKER engaged in protected activity as a citizen when he complained as the parent of E.F., about the unequal treatment and benefits of the girls' soccer program arising to unlawful sex discrimination in violation of Title IX.

126.    FAKER suffered adverse employment actions when he was issued an unsubstantiated Letter of Admonition and terminated from the coaching position he had held for over 20 years.

127.    Defendants subjected FAKER  to these adverse actions because of his participation in such protected activity relating to his speaking on a matter of public concern, including URMSTON's issuance of the Letter of Admonition and termination of FAKER from his coaching position, HART's participation in, approval or acquiescence of such actions as URMSTON's supervisor, and STALLWORTH's instigating such retaliatory actions by other Defendant's under a "cat's paw" theory;

128.    There was a causal link between FAKER's protected activity and these adverse employment actions that FAKER suffered.

129.    FAKER's interest in engaging in the speech outweighs Defendant's interest in

The Geddes Law Firm, P.C.
1575 Delucchi Lane, Suite 206
Reno, NV 89502
Phone 775-853-9455

promoting the efficiency in the workplace.

130.    As a result of the unlawful retaliation by Defendants, FAKER has suffered, and continues to suffer, losses, injuries, damages, and harm, including the following:

(a)    economic losses, including back pay, front pay, and pecuniary compensatory damages;

(b)    non-pecuniary, compensatory damages, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life; and

(c)    wrongful interference with his ability to find new employment in the future.

131.    As a result of this unlawful discrimination and retaliation by Defendants, FAKER has had to retain the services of attorneys in this matter, and he, therefore, is entitled to, and seeks reimbursement for, his attorneys' fees and costs, his expert-witness fees, and his court costs, in an amount to be proven at trial.

132.    As a result of this unlawful retaliation by Defendants, FAKER is entitled to, and seeks, declaratory relief, in the form of a declaration by this Court, that Defendants violated FAKER's rights by engaging in unlawful retaliation, as alleged herein.

133.    As a result of this unlawful retaliation by Defendants, FAKER  is entitled to, and seeks, injunctive relief, in the form of an injunction issued by this Court, that:

(a)    compels Defendant WCSD to remove false, adverse information contained in FAKER 's personnel files, relating to the claims of this case, and

(b)    if appropriate and feasible, compel Defendant WCSD to reinstate FAKER  to his prior employment position, with full pay and benefits, as if never terminated.

**VI.**

**PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFFS pray for judgment against Defendants, as follows:

1.    For equitable relief, including back pay and front pay;

2.    For general, compensatory damages on all claims, in an amount to be proven at trial;

3.    For special, compensatory damages on all claims, in an amount to be proven at trial;

4.    For past and future compensatory damages, including incidental and consequential

The Geddes Law Firm, P.C.
1575 Delucchi Lane, Suite 206
Reno, NV 89502
Phone 775-853-9455

losses, incurred by reason of Defendants' acts, omissions, carelessness, negligence, deliberate indifference, and other culpable conduct described herein, in an amount to be proven at trial;

5.    For exemplary and punitive damages, as allowed by law;

6.    For costs of the suit incurred herein;

7.    For attorneys' fees, costs, and prejudgment interest, as allowed by law;

8.    For experts' fees, costs as allowed by law, in an amount in an amount to be determined at trial;

9.    For declaratory and injunctive relief, equitably determined by the Court at trial.

10.    For such other relief as the Court may deem just and proper; and

11.    Pursuant to the *Federal Rules of Civil Procedure*, Rule 38, Plaintiff demands a trial by jury on all issues triable by right of a jury.

Dated this 14<u>th</u> Day of May 2020.        THE GEDDES LAW FIRM, P.C.

KRISTEN R. GEDDES
Nevada Bar Number 9027
The Geddes Law Firm, P.C.
1575 Delucchi Lane, Suite 206
Reno, Nevada 89502
(775) 853-9455
*Attorneys for Plaintiffs*

The Geddes Law Firm, P.C.
1575 Delucchi Lane, Suite 206
Reno, NV 89502
Phone 775-853-9455